| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE DEARBORN CIRCUIT COURT |
| COUNTY OF DEARBORN | ) | GENERAL TERM, 2013 |
| | | |
| TRI-STATE CARBONIC, LLC, | ) | |
| An Indiana limited liability company, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 15C01-1303-PL-<u>30</u> |
| | ) | |
| AIR LIQUIDE INDUSTRIAL U.S. LP | ) | |
| A Delaware limited partnership, | ) | |
| Defendant. | ) | |

**FILED**
MAR 0 1 2013
CLERK OF DEARBORN CIRCUIT COURT

## SUMMONS

THE STATE OF INDIANA TO DEFENDANT, <u>Capitol Corporate Services, Registered Agent, Air Liquide Industrial U.S. LP</u> ADDRESS: <u>5217 Palisade Court, Indianapolis, IN 46237</u>
You have been sued by the person(s) named "plaintiff", in the court stated above.

The nature of the suit against you is stated in the complaint which is attached to this summons. It also states the demand which the plaintiff has made against you.

You or your attorney must respond to the complaint in writing within twenty (20) days, commencing the day after you receive this summons, (you have twenty-three (23) days to answer if this summons was received by mail), or judgment will be entered against you for what the plaintiff has demanded.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written responsive pleading.

The following manner of service of summons is hereby designated: If by mail, stamped addressed envelopes with return receipt attached to be prepared by attorney.

Dated: March 1, 2013
Richard A. Butler, #16668-45
Attorney for Plaintiff
310 West High Street
Lawrenceburg, Indiana 47025
(812) 537-9820

_____
Clerk of Court of Dearborn County

### RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served the within summons:
(1) By delivering a copy of the Summons and a copy of the complaint to the defendant, _____ _____, on the _____ day of _____, 2013.

(2) By leaving a copy of the Summons and a copy of the complaint at _____, the dwelling place or usual place of abode of the said defendant, _____.

(3) _____

Sheriff's Fees:
Additional

Sheriff of Dearborn County, Indiana
By: _____

**EXHIBIT A**

Original for Clerk and copy for each defendant to be prepared by attorneys

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the _____ day of _____, 2013, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____ by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

_____
Clerk of Court of Dearborn County

Dated: _____, 2013.

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant, _____ was accepted by the defendant on the _____ day of _____, 2013.

I hereby certify that the attached return receipt was received by me showing that the summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2013.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant, _____ was accepted by _____, (Age) _____, on behalf of said defendant on the _____ day of _____, 2013.

_____
Clerk of Court of Dearborn County

## SERVICE ACKNOWLEDGED

A copy of the within Summons and a copy of the complaint attached thereto were received by me at _____, this _____ day of _____, 2013.

_____
Signature of Defendant

C:\WPWIN60\WPDOCS\CIVIL\SUMMONS.15C

| | |
|---|---|
| STATE OF INDIANA )<br>COUNTY OF DEARBORN ) | IN THE DEARBORN CIRCUIT COURT<br>GENERAL TERM, 2013 |

FILED
MAR 01 2013
CLERK OF DEARBORN CIRCUIT COURT

TRI-STATE CARBONIC, )
LLC, an Indiana limited )
liability company, )
          )
     Plaintiff, )
          )
v.        )    CAUSE NO. 15C01-1303-PL- 30
          )
AIR LIQUIDE INDUSTRIAL )
U.S. LP, a Delaware limited )
Partnership, )
          )
     Defendant. )

## COMPLAINT

Comes now the Plaintiff Tri-State Carbonic, LLC ("Tri-State"), by counsel, Richard A. Butler, and for its cause of action against Defendant Air Liquide Industrial U.S. LP ("Defendant Air Liquide") avers that:

1. On or about April 10, 2007, Defendant Air Liquide entered into a Liquid Carbon Dioxide Product Supply Agreement, a copy of which is attached as Exhibit A, (the "Agreement") wherein Defendant Air Liquide agreed, *inter alia*, to purchase at least Ten Thousand (10,000) tons of liquid carbon dioxide per year from Tri-State.

2. Defendant Air Liquide has breached the Agreement by failing and refusing to take or pay for at least Ten Thousand (10,000) tons of liquid carbon dioxide per year.

3. Tri-State has been damaged as a direct and proximate result of Defendant Air Liquide's breach of the Agreement in an amount presently unknown but to be proved at trial.

**WHEREFORE**, Tri-State respectfully request that the Court render judgment in its favor against Defendant Air Liquide in an amount sufficient to compensate Tri-State for its damages resulting from Defendant Air Liquide's breach of the Agreement, for interest, costs, and all other relief just and proper in the premises.

Respectfully submitted,

*/s/ Richard A. Butler*

Richard A. Butler (#16668-45)
Lawyer for Tri-State Carbonic, LLC
310 West High Street
Lawrenceburg, Indiana 47025
Telephone: (812)537-9820

1

# Liquid Carbon Dioxide
# Product Supply Agreement

This Liquid Carbon Dioxide Product Supply Agreement ("the Agreement") is made and entered into as of the 1st day of March, 2007, by and between Tri-State Carbonic, LLC, an Indiana limited liability company with offices located at 1300 Schenley Place, Greendale, Indiana 47025 ("Seller"), and Air Liquide Industrial U.S. LP, a Delaware limited partnership with offices located at 2700 Post Oak Blvd., Houston, Texas 77056 ("Buyer").

WHEREAS, the Seller owns and operates a carbon dioxide plant located at 601 Front Street, Lawrenceburg, Indiana (the "Plant") and has available quantities of liquid carbon dioxide which is available for sale at the Plant; and

WHEREAS, the Buyer wishes to purchase liquid carbon dioxide as defined in Exhibit Attached hereto and made part hereof ("Product") at the Plant.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, Seller and Buyer hereby agree as follows:

1. **Definitions**
   1.1 "Agreement" shall mean this Liquid Carbon Dioxide Product Supply Agreement.
   1.2 "Contract Year" shall mean each twelve (12) consecutive month period in which this Agreement is in effect, with the first contract year commencing February 1, 2007, and each Contract Year thereafter commencing on the anniversary date thereof.
   1.3 "Nonconforming Product" shall mean Product purchased from Seller by Buyer and which fails to meet, although intended to meet, the specifications set forth in Exhibit A attached hereto.
   1.4 "Product" shall mean liquid carbon dioxide that meets or exceeds the specifications set forth in Exhibit A.
   1.5 "Ton" shall mean a short ton of 2,000 pounds.
   1.6 "Plant" shall mean the liquid carbon dioxide production plant owned by Seller and located at 601 Front Street, Lawrenceburg, Indiana.
   1.7 "Shutdown Event" shall mean Sellers is unable to produce Product at the Plant.
   1.8 "Reduced Production" shall mean Seller is unable to produce and supply Product from the Plant to Buyer in the quantities required herein.

2. **Quantity**
Subject to the provisions of this Agreement, Seller agrees to sell and deliver to Buyer FOB the Plant and Buyer agrees to buy and take delivery from Seller FOB the Plant a minimum of Ten Thousand (10,000) Tons of Product per Contract Year (the "Base Quantity"). If Buyer does not take delivery of the Base Quantity in any Contract Year, the difference between the Base Quantity and the quantity of the Product Buyer actually bought during the Contract Year shall be invoiced by Seller at the end of the Contract Year at the prices defined in paragraph 6 hereof. In addition, Buyer shall have the right to buy FOB Plant, but is not obligated to buy, and Seller agrees to sell FOB Plant to Buyer, an additional Six Thousand (6,000) Tons of Product per Contract Year above the Base Quantity (the "Additional Quantity"). Buyer may buy but is not

Revision date March 7, 2007

2

obligated to buy such other quantities of Product from Seller in addition to the Base Quantity and the Additional Quantity as Seller, in its sole discretion, determines to sell to Buyer.

Buyer shall use reasonable efforts to take delivery of Product in substantially even weekly increments, but shall not incur any liability for failure to do so. Subject to the provisions of Section 3 hereof, Buyer has the right to buy and take delivery of the Base Quantity and any Additional Quantity as follows: up to Three Hundred and Fifty (350) Tons per week. The purchase of any Product in excess of Three Hundred and Fifty (350) Tons per week shall be at Seller's sole discretion.

### 3   Storage

Seller shall at all times reserve for Buyer's use One Hundred (100) Tons of Product in Seller's storage facilities at the Plant ("Buyer's Storage") in which Seller will deliver up to a maximum daily quantity of Fifty (50) tons of Product subject to space being available in Buyer's Storage. Exhibit B sets forth the procedures of managing and reporting the Product in Buyer's Storage. The foregoing notwithstanding, Seller may limit the delivery of Product to Buyer as provided in Section 2 Buyer and Seller reserve the right to negotiate for Buyer to install additional storage at the Plant.

### 4   Shutdown, Allocation and Reduction of Base Quantity

The Seller will advise the Buyer of any scheduled outages of the equipment, any Shutdown Event or Reduced Production as far in advance as practical. Except as set forth in Section 3, Seller assumes no liability whatsoever to Buyer related to any Shutdown Event scheduled or unscheduled or Reduced Production.

If a Shutdown Event occurs, Seller shall have no obligation to deliver Product over and above the amount in Buyer's Storage.

During any Reduced Production period, Seller may chose to allocate Product to Buyer on a pro rata basis to the extent available. The allocation shall be based on a percentage equivalent to Buyer's twelve (12) months average purchases divided by Seller's twelve (12) months average production, multiplied by the total Tons available.

> Example:
> Seller's twelve (12) months average production is One Hundred (100) Tons/day. Buyer's twelve (12) months average purchases are Fifty (50) Tons/day. If the Reduced Production rate is Sixty (60) Tons/day, then (30) Thirty tons would be allocated to buyer.
>
> (50 Tons/day) / (100 Tons/day) = 0.5 x 60 tons = 30 Tons allocated to Buyer.

If, within a Contract Year, Seller has Shutdown Events or allocates Buyer in excess of thirty (30) days cumulative total, the Buyers obligation to purchase the Base Quantity for that Contract year shall be reduced by thirty (30) tons per day for each day in excess of the thirty (30) days.



5. **Term**

The term of this Agreement shall be for a period of three (3) years commencing on February 1, 2007 (the "Initial Term") and terminating on January 31, 2010. Buyer shall have the right to extend this Agreement for up to three (3) separate two (2) year terms (an "Extension Term") by sending written notice to Seller at least six (6) months but not more than nine (9) months in advance of the end of the Initial Term or any Extension Term. The foregoing notwithstanding, this Agreement may be cancelled by Buyer or Seller at the end of the Initial Term or any Extension Term by sending written notice to the other party at least nine (9) months before the end of the Initial Term or Extension Term. In the event the Agreement is neither extended nor cancelled as provided above, then it will continue on a year to year basis unless cancelled by Buyer or Seller at least six (6) months in advance.

6. **Price**

A price per Ton of Product (hereinafter called the "Product Price") shall be paid by Buyer to Seller for Product purchased under this Agreement:

| Price Per Ton | Annual Tons |
|---|---|
| $54.00 | 0 – 9,000 |
| $46.00 | >9,000 |

Product Price shall remain firm for the Initial Term of this Agreement. At the end of the Initial Term, the Product Price may be adjusted yearly based on the percentage change to the U.S. Department of Labor Bureau of Labor Statistics for Industrial gas manufacturing – Carbon Dioxide, series Id: PCU32512032512O4 based on the September 2006 level compared to the September of the previous Contract Year.

7. **Payment Terms**

Seller shall submit invoices to Buyer on or about the 1st and 15th day of every month for Product delivered to Buyer since the preceding submission of invoices. Buyer shall pay Seller within thirty (30) days of the date of the invoice (unless such invoice is disputed in good faith by Buyer in which event Buyer will pay the undisputed portion of the invoice within such thirty (30) day period). The timely payment by Buyer of all undisputed amounts due and owing to Seller hereunder is an express condition to the continued performance by Seller of its obligations hereunder. Buyer shall pay a late charge of one and one-half percent (1.50%) per month on the balance of any overdue invoices.

8. **Product Quality**

Prior to delivery/releasing of Product to Buyer from Seller's storage tanks or from Buyer's Storage, Seller shall perform the tests set forth in Exhibit A for each batch of Product and record the lot number of each batch. Seller shall certify that each batch meets or exceeds the minimum specifications set forth in Exhibit A and shall make available to Buyer each lot number and the results of all such tests. Seller shall have in place procedures to prevent the contamination of the Product once certification has been completed.

In addition, the Buyer will provide, as necessary, a sample container which, upon Buyer's request, the Seller will properly fill with Product and send, at Buyer's expense, to a laboratory specified by the Buyer for analysis.

The Seller shall notify the Buyer of any Plant upsets or operational difficulties or changes that are likely to affect Product purity and shall perform, at Seller's expense, extra testing as necessary to detect Nonconforming Product.

Any dispute as to whether Product meets the specifications set forth in Exhibit A shall be resolved by submitting samples to an approved testing laboratory satisfactory to both Buyer and Seller. The Buyer and Seller shall equally share the cost of such analysis.

Buyer may, but shall not be required to, test and recertify the Product as desired.

## 9. Measurement

The amount of Product delivered to Buyer shall be measured by scale. Seller shall maintain and calibrate the scale as per state law at Seller's expense and provide calibration results to Buyer. Buyer shall keep the calibration results confidential. At Buyer's cost, Buyer may request, at any time, a test to verify the accuracy of the scales. Buyer shall keep the test results confidential.

## 10. Warranty

Seller warrants that the Product to be supplied under this Purchase Agreement will meet or exceed the specifications set forth in Exhibit A attached hereto and will also meet or exceed the requirements of United States Food Chemicals Codex 5th Edition 2003, CGA G-6.2-2004 Commodity Specification for Carbon Dioxide, Grade H. EXCEPT AS PROVIDED IN THIS AGREEMENT, THERE SHALL BE NO WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. SELLER'S SOLE OBLIGATION IN THE EVENT OF FAILURE OF PRODUCT TO CONFORM SHALL BE TO REPLACE OR REFUND THE PRODUCT PRICE OF THE NONCONFORMING PRODUCT.

## 11. Performance

If, for any reason, Seller is unable to supply to Buyer at least forty (40) Tons of Product per day for a total of ninety (90) days during any Contract Year, Buyer may, upon sixty (60) days' written notice to Seller, terminate this Agreement, unless Seller, during such sixty (60) day notice period supplies at least forty (40) Tons of Product per day each of the sixty (60) consecutive days of the notice period. Seller's right to avoid a termination by Buyer by restoring its ability to supply per the preceding sentence shall only apply to the first such instance of reduced availability of Product.

## 12. Right of First Refusal

If, during the Term of this Agreement, Seller desires to sell Product produced at the Plant to any other buyer under an agreement with a price or prices more favorable than those contained herein, then Seller shall first offer to sell the Product to Buyer at the same price and upon the same terms by promptly giving written notice to Buyer ("Right of First Refusal"). Buyer may exercise the Right of First Refusal by providing Seller notice of its election to do so within

Revision date March 7, 2007



twenty (20) days of receipt of the notice from Seller. If Buyer does not timely provide notice of its election, Buyer's Right of First Refusal shall be deemed to be waived and Seller shall be free to sell the Product to the other buyer.

### 13. Limitation of Liability

Buyer acknowledges that there are hazards associated with the use of the Product, that it understands such hazards, and that it is the responsibility of Buyer to warn and protect its employees and other exposed to such hazards through Buyer's storage and use of the Product.

NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL, OR PUNITIVE DAMAGES. Seller's sole liability and Buyer's sole remedy for any damages, including but limited to damages resulting from Product and/or Nonconforming Product manufactured by Seller or Seller's failure to deliver Product shall be limited to, at Seller's option, the refund of the Product Price or replacement of the Product. Buyer must notify Seller of any claim within fifteen (15) days of the event giving rise to such claim or such claim is waived. These limitations shall apply regardless of whether the claim for damages is based on breach of contract, breach of warranty, tort or otherwise, and shall apply even where such damages are caused, in whole or in part, by negligence, gross negligence or acts and omissions of Buyer or Seller.

If there is any injury (including death), loss or damage to the person or property of any third party (including employees of either party), each party agrees to indemnify the other party to the extent of the indemnifying parties' negligence

### 14. Assignment

This Agreement is not assignable by either Buyer or Seller, except upon the written consent of the other party; provided, however, that such consent shall not be unreasonably withheld and provided, further, that either party may assign this Agreement without the consent of the other party to a third party acquiring all or substantially all of its business or operations with respect to which this Agreement relates, or to a parent, subsidiary or affiliated entity.

### 15. Excuse of Performance/Force Majeure

Neither party hereto shall be considered in default in the performance of its obligations hereunder (other than its obligation to make any payments of money hereunder), or be liable in damages or otherwise for any failure or delay in performance which is due to Seller's loss of its source of feed gas, strike, lockout, concerted act of workers or other industrial disturbance, fire, explosion, flood or other natural catastrophe, civil disturbance, riot or armed conflict whether declared or undeclared, accident, act of God, or any other cause whether similar or dissimilar to any of the causes or categories of causes described above and which is beyond the reasonable control of the party claiming excuse hereunder, but not including economic hardship or business downturn.

The party having the Force Majeure event shall provide immediate phone and email notice to the other party following up by written notice to the other party within ten (10) days. The party claiming Force Majeure will immediately, upon the onset of the Force Majeure event, commence

6

and diligently pursue corrective action at its expense. The party not claiming Force Majeure may terminate this Agreement if the Force Majeure event or the nonperformance by the other party is in effect for more than a total of three (3) months during the Initial Term or any Extension Term.

### 16. Notices

Any Notice hereunder by either of the parties to the other shall be given by registered mail or by facsimile (immediately confirmed by a copy thereof sent by registered mail) addressed as herein below provided. Unless and until another address or addresses shall be furnished in writing to either party, notices shall be addressed as follows:

> Tri-State Carbonic, LLC.
> 1300 Schenley Place
> Greendale, Indiana 47025
> Attn: Barry Nanz, Manager
> Air Liquide Industrial U.S. LP
> 2700 Post Oak Boulevard, Suite 1800
> Houston, Texas 77056
> Attn: Manager CO2 Sourcing
>    Manager CO2 Resource Planning

### 17. General Provisions

Buyer shall provide appropriate storage vessel(s) for the safe delivery of Product.

This Agreement sets forth the entire Agreement between the Seller and Buyer with respect to the purchase and sale of Product for use at Buyer's site.

No amendment, modification, change, waiver or discharge of, or addition to, any provision of this Agreement shall be effective unless the same is in writing and is signed or otherwise assented to in writing by an authorized individual on behalf of each party, and unless such writing specifically states that the same constitutes such an amendment, modification, change, waiver or discharge or, or addition to, one or more provisions of this Agreement.

This Agreement shall be governed, construed and enforced in accordance with the internal laws of the State of Indiana, without regard to principles of conflicts of law. The parties hereto each consent to the jurisdiction of the courts of the State of Indiana to resolve any disputes that may arise out of this Agreement or the transactions contemplated thereby.

The paragraph headings contained in the Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement or of any provisions hereof.

If any provision of this Agreement shall be held invalid or unenforceable by a court of competent jurisdiction, then such provision shall be reformed to conform with applicable law and, as practicable, the party's intent, or if it cannot be so reformed, then it shall be deemed deleted, without affecting the validity of the rest of the Agreement, which shall remain in full force and effect.

Revision date March 7, 2007 

7

IN WITNESS THEREOF, the parties are executing this Agreement in duplicate originals as of the date first noted above.

| Tri-State Carbonic LLC | Air Liquide Industrial U.S. LP |
|---|---|
| By: *[signature]* | By: *[signature]* |
| Name: Barry Nave | Name: Etienne Lepeutre |
| Title: Mgn Member | Title: President |
| Date: 4/5/07 | Date: 4/10/2007 |

8

## Exhibit "A"
## Carbon Dioxide Specifications

### Standard Commercial Quality
(Tests are run on vaporized liquid)

| Parameter | Formula | Units | CGA Grade H |
|---|---|---|---|
| Carbon Dioxide Purity | $CO_2$ | % vol | ≥ 99.5 |
| Water Vapor | $H_2O$ | ppm vol | ≤ 20 |
| Maximum Dew Point | $H_2O$ | °F | -68 |
| Total Hydrocarbon (as Methane) | $CH_4$ | ppm vol | ≤ 50 |
| Oxygen | $O_2$ | ppm vol | ≤ 50 |
| Carbon Monoxide | CO | ppm vol | ≤ 10 |
| Nitric Oxide/Nitrogen Dioxide | NO & $NO_2$ | ppm vol | ≤ 5 (total of NO + NO2) |
| Non Volatile Residue | N/A | ppm wt | ≤ 10 |
| Total Volatile Hydrocarbons as Methane | N/A | ppm vol | ≤ 50 |
| Acetaldehyde | $CH_3CHO$ | ppm vol | ≤ 0.5 |
| Total Sulfur Content | S | ppm vol | ≤ 0.5 |
| Sulfur Dioxide | $SO_2$ | ppm vol | ≤ 5 |
| Carbonyl Sulfide | COS | ppm vol | ≤ 0.5 |
| Hydrogen Sulfide | $H_2S$ | ppm vol | ≤ 0.5 |
| Odor in Water | N/A | None | No foreign |
| Appearance in Water | N/A | None | No color or turbidity |
| Taste in Water | N/A | None | No foreign |

All Product shall meet the requirements for CGA G-G.2-2004 Grade H and will be tested according to the methods as specified therein.

Revision date March 7, 2007



## Exhibit "B"
## Inventory Management

| Date | Daily Production | AL Daily Product Theoretical Storage | AL Beginning Inventory | AL Max Inventory= 100 / AL Product to Storage | AL Purchases | Net Inv Gain/(Loss) | AL Ending Inventory | Down Days |
|---|---|---|---|---|---|---|---|---|
| 2/1/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/2/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/3/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/4/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/5/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/6/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/7/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/8/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/9/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/10/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/11/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/12/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/13/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/14/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/15/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/16/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/17/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/18/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/19/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/20/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/21/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/22/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/23/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/24/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/25/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/26/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/27/2007 |  | 100.0 |  |  |  |  |  |  |
| 2/28/2007 |  | 100.0 |  |  |  |  |  |  |
| TOTALS |  | - |  |  | 0.0 |  |  | 0 |

TOP
Responsibility
Actual Purchases  -
TOP
Shortfall/Overage
Actual Purchases



Revision date March 7, 2007